AO 106 (Rev. 04/10) Application for a Search Warrant (Modified WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>SUBJECT DEVICES STORED AT 1000 2ND<br>AVENUE, SEATTLE WASHINGTON 98104 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   MJ21-047

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846<br>18 U.S.C. §§ 1956, 1960 | Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates<br>Money Laundering, Operating an Unlicensed Money Transmission Business |

The application is based on these facts:

✓ See Affidavit of Special Agent Victor Morales, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: [x] by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Victor Morales, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   January 26, 2021

_____
*Judge's signature*

City and state:  Seattle, Washington

Hon. Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF VICTOR MORALES

STATE OF WASHINGTON )
                                              )     ss
COUNTY OF KING )

I, VICTOR MORALES, being first duly sworn, hereby depose and state as follows:

### AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"). As a Special Agent, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801, et seq., and other violations of federal law.  I have been in law enforcement for twelve years.  I have been a Special Agent with the DEA for the past four years.  I have received narcotics enforcement training over the course of seventeen weeks at the DEA Basic Agent Training academy in Quantico, Virginia.

2.      Throughout my career, I have conducted numerous narcotics investigations, including those leading to arrest and prosecution.  From these experiences, I have become familiar with common slang terms and codes used by drug traffickers and their associates to refer to drugs, money, guns, vehicles, compartments, and other things related to their drug trafficking.  I have learned how they attempt to thwart law enforcement by using code terms, multiple cell phones, concealed compartments, "stash houses," and other means.  I have become familiar with the ways in which drugs commonly are transported, stored, and sold, and also how members of a conspiracy communicate with each other.  I am also familiar with common ways in which drug traffickers attempt to profit from their illegal activities, by hiding drug proceeds in various places in order to conceal the illegal source or their ownership, including hiding and transporting bulk cash, sending funds through wire transfers or bank accounts in other persons' names, or investing in assets placed in other persons' names.

3.      I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  smuggling, distribution, packaging, trafficking, avoiding law enforcement, and

2  laundering proceeds, among other concerns related to drug trafficking.  I have discussed

3  and learned from other law enforcement investigators in regard to these matters, as well.

4  <u>**PURPOSE OF AFFIDAVIT**</u>

5      4.    I make this affidavit in support of an application under Rule 41 of the

6  Federal Rules of Criminal Procedure for a search warrant authorizing the examination of

7  the following digital devices[1] or other electronic storage media:[2]

8          a.    A Silver iPhone 6s Model A1633 (2021300100001601-1)

9  **(SUBJECT DEVICE 1)**;[3]

10          b.    A Silver Apple iPhone in Clear Case with Red Trim

11  (2020300100013101-8) **(SUBJECT DEVICE 2)**;

12          c.    Small media storage devices (2020300100013101-9) **(SUBJECT**

13  **DEVICE 3)**;

14          d.    A White Apple iPhone (2020300100011901-12) **(SUBJECT**

15  **DEVICE 4)**;

16          e.    A Black LG Cell Phone (2020300100011901-12) **(SUBJECT**

17  **DEVICE 5)**;

18

19

---

20  [1] "Digital device" includes any device capable of processing and/or storing data in electronic

21  form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet

22  computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications

23  devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices,

24  personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

25

26  [2] Electronic Storage media is any physical object upon which electronically stored information

27  can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

28  [3] The number contained in the parenthetical refers to law enforcement's internal seizure number.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       f.     An Apple iPhone in a Black Case (2020300100011901-12)

2 **(SUBJECT DEVICE 6)**;

3       g.     A Tower RM850X Computer (2020300100011901-18) **(SUBJECT**

4 **DEVICE 7)**;

5       h.     A Black Apple iPhone Model A1661 (2020300190000601-18)

6 **(SUBJECT DEVICE 8)**;

7       i.     A Gray Apple iPhone 11 Pro (2020300190000601-19) **(SUBJECT**

8 **DEVICE 9)**;

9       j.     A Gray Apple iPhone 8 Plus (20200300190000601-20) **(SUBJECT**

10 **DEVICE 10)**;

11       k.     A Gray Apple iPhone 5 Model A1429 (2020300190000601-21)

12 **(SUBJECT DEVICE 11)**;

13       l.     A Silver Apple MacBook Air Model A1466 (2020300190000601-

14 24) **(SUBJECT DEVICE 12)**;

15       m.     A Gray Apple MacBook Air Model A1989 (2020300190000601-25)

16 **(SUBJECT DEVICE 13)**;

17       n.     A Silver HP Laptop Model 14 (2020300190000601-26) **(SUBJECT**

18 **DEVICE 14)**;

19       o.     A Black/Silver Dell XPS Laptop Model PP28L

20 (2020300190000601-28) **(SUBJECT DEVICE 15)**;

21       p.     A Gray Apple iPad Model A1674 (2020300190000601-29)

22 **(SUBJECT DEVICE 16)**;

23       q.     A Gray Apple iPad Model A1893 (2020300190000601-30)

24 **(SUBJECT DEVICE 17)**;

25       r.     A Black Samsung Tablet Model SM-T217S (202030019000601-31)

26 **(SUBJECT DEVICE 18)**; and

27       s.     19 USB Drives (2020300190000601-33) **(SUBJECT DEVICE 19)**;

28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  hereinafter the "**SUBJECT DEVICES**," which are currently in law enforcement

2  possession, and the extraction from those devices or electronic storage media of

3  electronically stored information described in Attachment B.

4        5.    The facts set forth in this Affidavit are based on my own personal

5  knowledge; knowledge obtained from other individuals during my participation in this

6  investigation, including other law enforcement officers; review of documents and records

7  related to this investigation; communications with others who have personal knowledge

8  of the events and circumstances described herein; and information gained through my

9  training and experience.

10        6.    Because this Affidavit is submitted for the limited purpose of establishing

11  probable cause in support of the application for a search warrant, it does not set forth

12  each and every fact that I or others have learned during the course of this investigation.  I

13  have set forth only the facts that I believe are necessary to establish probable cause to

14  believe that evidence, fruits and instrumentalities of violations of Title 18, United States

15  Code, Sections 1956 (Money Laundering), 1960 (Operating an Unlicensed Money

16  Transmitting Business) and Title 21, United States Code, Sections 841 and 846

17  (Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates) will be

18  found on the **SUBJECT DEVICES.**

19        7.    This application is being presented by electronic means pursuant to Local

20  Criminal Rule 41(d)(3).

21        **<u>SEIZURE OF THE SUBJECT DEVICE TO BE EXAMINED</u>**

22        8.    **SUBJECT DEVICE 1** was seized on July 14, 2020, during the arrest of

23  KENNETH JOHN RHULE in the District of Hawaii.

24        9.    **SUBJECT DEVICE 2** and **SUBJECT DEVICE 3** were seized on March

25  13, 2020, from KENNETH WARREN RHULE's GMC Truck.

26        10.    **SUBJECT DEVICE 4** through **SUBJECT DEVICE 8** were seized on

27  March 10, 2020, during the execution of a federal search warrant at 3614 183rd Street

28  Southeast in Bothell, Washington.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.     **SUBJECT DEVICE 9** through **SUBJECT DEVICE 17** were seized on March 10, 2020, during the execution of a federal search warrant at 29428 181st Street in Monroe, Washington.

12.     The **SUBJECT DEVICES** are currently located at 1000 2nd Avenue, Seattle, Washington 98104.

13.     The warrant would authorize the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

14.     The **SUBJECT DEVICES** are currently in the lawful possession of HSI. The **SUBJECT DEVICES** are currently in storage at 1000 2nd Avenue, Seattle, Washington 98104.  In my training and experience, I know that the **SUBJECT DEVICES** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICES** first came into the possession of HSI.

## **PRIOR WARRANTS**

15.     On February 28, 2020, the Court issued a warrant, authorizing the search of 29428 181st Street in Monroe, Washington.  *In the Matter of the Search of 29428 181st Street SE in Monroe, Washington, also assigned the address 29209 Cedar Ponds Road in Monroe, Washington, more fully described in Attachment A-1*, MJ20-099 (W.D. Wa. Feb. 28, 2020).  During the execution of that warrant, agents seized **SUBJECT DEVICE 9** through **SUBJECT DEVICE 17**.

16.     On February 28, 2020, the Court also issued a warrant, authorizing the search of 3614 183rd Street Southeast in Bothell, Washington.  *In the Matter of the Search of 3614 183rd Street SE in Bothell, Washington more fully described in Attachment A-2*, MJ20-100 (W.D. Wa. Feb. 28, 2020).  During the execution of that warrant, agents seized **SUBJECT DEVICE 4** through **SUBJECT DEVICE 8**.

17.     On March 13, 2020, the Court issued warrants, authorizing the search of KENNETH WARREN RHULE's GMC vehicle, along with digital devices located

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

therein.  *In the Matter of the Search of GMC Sierra Truck with License Plate C30354L currently located at Federal Detention South, 4735 E. Marginal Way South, Seattle, Washington, more fully described in Attachment A-2*, MJ 20-126 (W.D. Wa. Mar. 13, 2020); *In the Matter of the Search of SUBJECT DEVICES, currently located on 1000 2nd Avenue, Seattle, Washington, more fully described in Attachment A-1*, MJ20-125 (W.D. Wa. Mar. 13, 2020). During the execution of those warrants, agents seized **SUBJECT DEVICE 2** and **SUBJECT DEVICE 3**.

18.    On July 8, 2020, the Court issued a warrant, permitting seizure of evidence created in October 2014 and thereafter, located on **SUBJECT DEVICE 8** through **SUBJECT DEVICES 19**.  *In the Matter of the Search of Subject Devices Stored at 1000 2nd Avenue, Seattle, Washington 98104*, No. MJ20-407 (W.D. Wa. July 8, 2020).

19.    On July 15, 2020, the District Court for the District of Hawaii issued a warrant, authorizing the search of **SUBJECT DEVICE 1**.  *In the Matter of the Search of Three items of luggage and one Apple iPhone S, Model A1633, described in Attachments A-1 and A-2*, No. MJ20-866 (D. Hawaii July 15, 2020).

## THE INVESTIGATION

### I.    Summary of Investigation

20.    As described herein, KENNETH J. RHULE (hereinafter referred to as "RHULE"), and his son, KENNETH W. RHULE, have been indicted for violating 18 U.S.C. §§ 841, 846 (Conspiring to Manufacture and Distribute Marijuana Distillates and Extracts).  KENNETH W. RHULE has also been indicted for violating 18 U.S.C. § 1960 (Conducting an Unlicensed Money Transmitting Business) and 18 U.S.C. § 1956 (Money Laundering).  Both were arrested in March 2020 and July 2020, respectively.  Since his arrest, KENNETH J. RHULE has remained detained.

21.    RHULE, along with KENNETH W. RHULE, operated the company HerbinArtisans.  From at least 2015 until March 2020, HerbinArtisans manufactured and sold marijuana distillates and extracts, including online through Instagram.  These marijuana distillates and extracts include those referred to as "wax," "shatter," "clear,"

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and marijuana buds, products that contain THC and are marijuana products regulated by the State of Washington.  Despite selling marijuana products, neither RHULE nor HerbinArtisans were listed as applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington.

22.     Additionally, KENNETH W. RHULE sold bitcoins to individuals in exchange for cash without registering with Financial Crimes Enforcement Network ("FinCEN") or the Washington Department of Financial Institutions ("DFI"), in violation of 18 U.S.C. § 1960.  KENNETH W. RHULE, using the moniker Gimacut93, advertised in-person cash-for-bitcoin exchanges on the website localbitcoins.com.  From April 2018 until December 2018, law enforcement, or a cooperating source working with law enforcement, exchanged more than $140,000 in cash for bitcoin with KENNETH W. RHULE or his designee.  When completing these transactions, KENNETH W. RHULE did not ask any "Know Your Customer" information.

## II.     HerbinArtisans

### A. Marijuana Distillation & Extraction

23.     Since at least 2015, HerbinArtisans has manufactured and sold marijuana products.  HerbinArtisans maintained an Instagram page dedicated to marketing and selling the HerbinArtisans product—high-grade THC distillates.  The HerbinArtisans page included photos of highly concentrated THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips, diamonds, and other forms of extracts and distillates.

24.     On January 29, 2020, the HerbinArtisans account had 324 posts, 1,058 followers, and contained the description "PNW Extracts and Distillate[.]  All our own work [.]  Nothing for sale[.]"  Previously, the HerbinArtisans account included the language "DM for inquiries[.]  Bitcoin and Crypto Friendly."  The HerbinArtisans account was created on March 26, 2016, using the registered email address kenny@herbinartisans.com, used by KENNETH W. RHULE.  As of June 12, 2020, the account remained active, but has since been deleted.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

25.     The posts for this account included multiple photographs and videos.  A portion of these photographs are included below:



 **herbinartisans** Some more #goldenticket shatter, who's wants a golden ticket? #herbinartisans



 **herbinartisans** Stable D9 #distillate #cat2

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970




herbinartisans BCSP ready to go
#herbinartisans #klearkrew #flower
#mmj #seattle




herbinartisans Cookies coming out
💧#GSC #seattle #420 #710
#herbinartisans #klearkrew
#heady.watr

26.    Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "shatter," "oil," "clear," and marijuana buds.

27.    In addition to posting photographs of marijuana distillates and extracts, KENNETH W. RHULE used the HerbinArtisans Instagram page to send and receive direct messages—private communications—with others regarding HerbinArtisans' products.  For example, the following communications were sent to and from the HerbinArtisans Instagram account:

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

     a.    On June 18, 2019, coastisclearnj messaged HerbinArtisans "You guys have any d9 liters in the 6-6.5 range?  Crypto ready."

     b.    On May 13, 2019, solteksolutions messaged HerbinArtisans "Can you contact me in regards to bulk shatter and distillate orders?  I need 6 lb of shatter currently and 1L of clear distillate."

     c.    On March 12, 2019, erikkve messaged HerbinArtisans "Warm greetings to you and your crew! . . . I'd like to inquire about a small order of raw distillate (for edible or dab use) . . . I've already sent my WA state medical card."  In response, HerbinArtisans directed erikkve to communicate via encrypted messaging service Wickr.

28.    Based on my review of the Instagram direct messages, HerbinArtisans would often tell prospective clients to switch over to encrypted messaging services like Wickr and Signal to continue negotiations for product sales.  For example, on July 14, 2017, northwest_dabber sent a message to HerbinArtisans, stating "I Need a ticket on distillate gram syringes bulk and best quality nug run slabs or good white plant/trim runs."  In response, HerbinArtisans asked "You have signal" and provided a telephone number associated with KENNETH W. RHULE.

29.    When selling marijuana extracts and distillates, HerbinArtisans accepted cash and cryptocurrency.  For example, on January 6, 2018, chevy_710 messaged HerbinArtisans asking "Price in distillate?"  HerbinArtisans responded "I only accept cryptos, local for cash."  Additionally, on February 21, 2018, dankables sent a message to HerbinArtisans stating "Hey homie was wondering whats good on wholesale distillate, were looking to launch a cart line real soon just need a solid source for our distillate."  In response, HerbinArtisans asked "Okay would you buy local to Wa or crypto?"  On March 14, 2018, HerbinArtisans told another potential purchaser, fatboy.305, "Future reference crypto is the only means of accepting payment."

## B. Search of HerbinArtisans Production Facility

30.    Since August 2016, HerbinArtisans has been extracting and distilling these marijuana products at a property located at 29428 181st Street SE, Monroe, Washington,

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  which is also assigned the address 29209 Cedar Ponds Road, Monroe, Washington (the

2  "Monroe Property").  On March 10, 2020, agents searched this location, along with

3  others, pursuant to warrants.

4       31.    On March 10, 2020, RHULE was living at the Monroe Property, and was

5  present when law enforcement agents executed the search warrants.

6       31.    As described below, during these searches, agents located bulk marijuana,

7  marijuana distillates, and drug paraphernalia, among other items.  When agents searched

8  the property they found the following:

9            a.    Inside a warehouse, agents found processing equipment and

10 materials dedicated to the extraction and concentration of marijuana including: various

11 types of industrial-grade machinery, steel tables, industrial amounts of dry ice, dry-ice

12 storage bin coolers, metal cylinders of various sizes, flexible metal hoses, pressure

13 cylinders, various pumps, industrial scales, stainless steel pressure cylinders, pressure

14 covers, vacuum pumps, electric motors, a mini dryer, a terpene trap, tube racks, mixers,

15 chemistry mixers, multiple ovens and drying racks containing marijuana distillate

16 products.

17           b.    Inside the warehouse, agents also found associated materials and

18 equipment, including a label maker, bins, buckets, industrial fans, multiple industrial

19 sized pressurized gas tanks, a shop-vac, heavy-duty dollies, ladders, welding equipment,

20 industrial amounts of "monodisperse silica gel," "aromatizing clay," large quantities of

21 mylar bags, multiple jars and lids, rubber gloves, and other items used to manufacture

22 and produce controlled substances.

23           c.    Inside the warehouse, agents also found approximately 29 large

24 garbage bags filled with marijuana plant material and multiple glass jars containing

25 refined marijuana distillate products.  Agents further found a large rotary evaporator with

26 multiple large glass flasks, a heavy-duty press, and a 50-gallon tank of pressurized

27 butane.

28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        d.     Agents found numerous pre-printed documents headlined

2 "Hydrocarbon Inventory Process worksheet" throughout the warehouse which detailed

3 the weight and results of the extraction process.  These pre-printed worksheets were

4 completed with handwritten notes from various individuals whose identities have not

5 been verified.  Fields on the work sheet include: "Date" and "Assembly" (often filled out

6 with a name or left blank).  Each worksheet contained information for four "columns"

7 (steel cylinders used to extract THC) with a "weight" and "strain" field for each column.

8 Three fields for "Wet Weight," "Dry Weight," and "Slab Count" were present.

9        e.     Between the residence, where RHULE was residing at the time, and

10 the warehouse, investigators located a tent containing:  (1) six 50-gallon drums of "N-

11 Heptane," a highly flammable alcohol used in the marijuana distillate extraction process;

12 and (2) three assault rifles with loaded magazines.  Next to the tent, investigators found a

13 white 2008 Dodge Sprinter transport van.  An extension cord running from a nearby shed

14 into the front passenger side of the van was plugged into an electric air purifier which

15 rested on the dashboard.  Numerous small air-fresheners were scattered around the van.

16 Modifications had been made to block the ventilation system along the front wall of the

17 separate rear cargo transport area.  Investigators believe that this cargo van was used to

18 transport unprocessed marijuana plants for the production and manufacturing of

19 marijuana distillate products.

20        f.     In total, agents found approximately 1,000 kilograms of bulk

21 marijuana or marijuana extracts, with packaging, when they executed search warrants in

22 connection with this case in March 2020.

23 **C. RHULE's Role in HerbinArtisans**

24       32.     As described herein, RHULE is one of the primary operators of

25 HerbinArtisans, making the initial capital investment in the company and participating in

26 the manufacture of marijuana products.

27       33.     RHULE is believed to serve as the Chief Executive Officer of

28 HerbinArtisans.  According to an organizational chart located on KENNETH W.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  RHULE's computer, last modified in 2016, "Ken"—believed to be RHULE—was listed

2  as the "CEO," while "Kenny"—a name used by KENNETH W. RHULE—was listed as

3  the "COO" of an organization.  While this organizational chart is not titled, and does not

4  state which organization it describes, it is believed to be an organizational chart for

5  HerbinArtisans.  Notably, other individuals, also associated with HerbinArtisans, were

6  listed in subordinate roles with the titles "Garden technician," "Processing lead,"

7  "Processor," and "VP" on this chart, including C.E., described in further detail below.

8          34.     In operating HerbinArtisans, RHULE used the cloud-based accounting

9  software, Xero, to record HerbinArtisans' profits, expenses, invoices, and other data.

10  According to an Income Statement saved in this account, from 2015 until 2019,

11  HerbinArtisans earned a "Total [Gross] Income" of $13,710,069.27 and a "Net Income"

12  of $2,5774,850.33.

13          35.     The Xero data also indicates that RHULE is a part owner or operator of

14  HerbinArtisans.

15          a.      According to Xero, "Ken R," using the email address

16  krhule@icloud.com, was listed as an active user for the account, with the following roles:

17  "Financial Adviser; Standard; Manage Users; Payroll Administration; Subscriber; Bank

18  Account Admin."  RHULE, using this account, was also listed as the primary

19  "Subscriber" for the Xero account, while all other individuals were listed as "Invited

20  User[s]."

21          b.      RHULE logged into Xero and updated HerbinArtisans' records,

22  using the username krhule@icloud.com, over 200 times from August 2015 until

23  December 2019.

24          c.      RHULE's counsel has claimed that RHULE provided his Xero login

25  credentials to be used by his son, KENNETH W. RHULE, and another HerbinArtisans

26  employee.  However, at least a portion of these logins were completed using Internet

27  Protocol ("IP") addresses that RHULE also used to access his Apple account,

28  cryptocurrency account, or email account.  For example, on May 16, 2019, RHULE's

1   Xero account was accessed using the IP address 193.37.254.27.  According to public

2   databases, this IP address is associated with a Virtual Private Network ("VPN"), used to

3   encrypt communications and mask IP addresses.  Once accessed from this IP address,

4   RHULE's Xero account was used to complete more than 100 transactions, a portion of

5   which are depicted in the chart below.

| _messagetime | ac_username | ac_ip | p_act | cs_raw_url |
|---|---|---|---|---|
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/engage |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | GET | /apiv2/Organisations/!7IXmq |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | GET | /apiv2/analytics/decide |
| 5/16/2019 21:21 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |
| 5/16/2019 21:21 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/engage |
| 5/16/2019 21:20 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |

13   RHULE used this same IP address to access his Apple account, including on May

14   16, 2019.  For example, RHULE used this IP address to complete two iTunes

15   transactions, including downloading the encrypted chat application, Wickr, onto his

16   iPhone.



| create_ts | email_addr_txt | first_n | last | street_1_name | city_name | sta | ar | phone | ip_addr_tx | provider_nam |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018-10-10 03:54:26 | kenrhule@outlook.com | kenneth | rhule | 19025 163rd ct ne | Woodinville | WA | 360 | 9137158 | 193.37.254.27 | Whitepages.com |
| 2019-05-16 16:15:45 | kenrhule@outlook.com | ken | rhule | 29428 181st se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Wickr, LLC |

19   RHULE also used this IP address to update his iTunes account over 60 times, including,

20   on May 16, 2019, updating applications for his cryptocurrency wallets, his financial

21   accounts, and his encrypted email account.

| create_ts | email_addr_txt | fir | last | street_1_nam | city_r | st | a | phone | ip_addr_tx | content_name | platform |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019-05-16 23:28:16 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | SunTrust Mobile App | iPhone |
| 2019-05-16 23:28:18 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Bitpie Blockchain Wallet | iPhone |
| 2019-05-16 23:28:20 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Cake Wallet for XMR Monero | iPhone |
| 2019-05-16 23:28:21 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | EasyMeasure | iPhone |
| 2019-05-16 23:28:26 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | ProtonMail - Encrypted Email | iPhone |
| 2019-05-16 23:28:33 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Monero Wallet by Freewallet | iPhone |
| 2019-05-16 23:28:35 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Revolut - Radically Better | iPhone |

26   Furthermore, RHULE used this IP address to login to his Apple account on 170 occasions

27   (from August 2018 through May 2019), and to access his iCloud account over 300 times

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(in June 2019).  Finally, RHULE used this IP address to access his Gemini cryptocurrency account on January 16, 2020, as shown below.

| User Sessions Created Date | User Sessions IP | User Se | User Sessions Browser |
|---|---|---|---|
| 2020-01-16 | 193.37.254.27 | iPhone | Gemini Mobile |

d.      Additionally, according to statements saved in the account, from August 2015 until April 2017, HerbinArtisans issued more than $25,000 in payments to "Kenneth Rhule," "Ken R," or "Ken Rhule."

e.      From December 2015 until May 2018, "Kenneth J" also received more than $150,000 in payments from HerbinArtisans for, among other things, payroll, expense reimbursement, and loan repayments.  Notably, these payments were often made in Bitcoin.

36.      In operating HerbinArtisans, RHULE communicated with others, including KENNETH W. RHULE, regarding the company and its marijuana products.   For example, law enforcement located text messages exchanged with RHULE[4] in an iMessage archive, saved on KENNETH W. RHULE's computer, searched pursuant to a warrant.

a.      In these text messages, RHULE described his investment in HerbinArtisans.  For example, on March 30, 2015, RHULE sent the following text message to KENNETH W. RHULE:

> Let's talk in person... I don't wanna say something out of frustration.  I've got well over 6 figures into this, and I've received a grand total of $425 from a QP on the first aero trial run.  I have been totally flexible as you've drawn living costs, and lent funds to [M].  I'm not sure what the issue is, although you can't quit whenever somethjng gets stressful.  It takes a lot of time to get somethjng off the ground, and requires patience.  The damn construction isn't even done yet.  Things get much smoother when it seen through.  This op at the warehouse is 95% done.  It's setup to generate 2535lbs per room every 60 days (which is 2535 lbs once per month out of

---

[4] In these text communications, RHULE used the telephone number 425-770-2759, which has also been used by RHULE when opening financial accounts.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

alternating rooms) that is $5070k per month, plus the trim that it yields. That, along with supplemental oil to keep the system running is another 2535k per month.  That can be run smoothly with just [C and M2] (or 2 employees ).  That's roughly 100k per month in revenue with costs of less that 18k per month... That leaves uswith 80k per month for you and I. When the construction is finished, that output becomes a walk in the park. As the employees get familiar with the systems, they dial them in further and can do it in their sleep.  It doesn't need to be stessful. It doesn't need [M], end user sales, etc.  Simply moving volume wholesale to a small handful of people.  After the setup is done, this whole thing can operate with A couple of people, it really won't be that involved.  It's time consuming because it involved construction and learning the industry. Both of those variables are nearly complete now.  Anyhow ... Let's talk so I can better understand.

      b.     Similarly, on April 21, 2015, RHULE sent the following message to KENNETH W. RHULE, which stated, in part:

All working capital has come from me, all infrastructure has come from me, all tools, equipment, inventory, vehicles, etc. have come from me, the building rent and utilities are paid by me, and he is still having a hard time cash flowing... Like I told [J] day 1... You need to model the business around a dead minimum of $200k per month in revenues, otherwise the baseline expenses will be too high to make any worthwhile profits...

      c.     In these text communications, RHULE also discussed selling HerbinArtisans' product, including on the dark web.  For example, on April 24, 2015, RHULE sent the following message to KENNETH W. RHULE, which stated, in part: "[M] sold another grand worth today roughly.  Also, I have some KILLER deep web locations for selling . . ."

      d.     Similarly, on April 25 ,2015, RHULE sent the following message to KENNETH W. RHULE, which stated: "I wanted to show you the dark sites… I'll make you a bootable anonymous browser."

      e.     On May 5, 2015, RHULE sent KENNETH W. RHULE a photograph of a white board, which had the following text, among others written on it:

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   "Our core competency is: The production & sales of Marijuana Products!"  Along with
2   this photograph, RHULE sent the text "FYI posted in concentrate room…"

3          f.      On November 12, 2015, RHULE sent the following message to
4   KENNETH W. RHULE, which stated, in part: "I am putting out more ad's with better
5   keywords... There ads don't pop up with all the keywords, and are pretty basic... I'm
6   jazzing them ups bit and making them more visible, but wanted to set prices to be able to
7   hand it off to them where they make a reasonable profit built in..."

8          g.      On October 6, 2014, RHULE also texted KENNETH W. RHULE:

9       Ok, stay till Wednesday, your already making the trip, what's another day?
10      But try to get back Wednesday, Thursday latest so we can take the next
        step... It's time to get the 3 rooms automated, meaning float switches that
11      keep reservoirs topped off, dosage pumps that keep nuts and ph dialed in ,
        etc. the aero works flawless now... Shit is so much less stress. Getting to be
12      more enjoyable not as much engineer and build, more gardening….
13
14  Based on my training and experience, and other information learned during the course of
15  this investigation, I recognize the above text as discussing a marijuana grow operation.

16      37.     Additionally, law enforcement located text messages exchanged with
17  RHULE in KENNETH W. RHULE's Google account, saved in his Google Photos,
18  searched pursuant to a warrant.  For example:

19          a.      A screenshot of a text message exchanged with "Boss Hoggins"—
20  believed to be RHULE—KENNETH W. RHULE, and C.E. (another HerbinArtisans
21  employee) was saved in KENNETH W. RHULE's Google account.  This text message
22  was last modified on August 20, 2016, and was located a Google photos folder entitled
23  "2015-12-15-16."  In this text message, C.E. stated:

24      We have too many hands on the purge process.  We consistency make
        errors on the assemblies and there is constant confusion.  I think we need to
25      develop a system where 2-3 people max are purging consistently at
        consistent times, like clockwork.  thoughts?  The little oven got up to 130
26      under a full vac with no one really keeping an eye on it.  Lots of accidental
27      waxation that could be avoided.
28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In response, another person, believed to be KENNETH W. RHULE, stated:

> That's pretty much the schedule. Th blasters will prepare the assemblies in unleashed. If need be they will scrape and also label the un-purged patties. The purgers, [E.C] and I. Start the purging early in the morning. [C.E.], you and I are the shift leads. We both need to keep a close eye on these processes, it's the core of our business. That being said, I'm safe to assume the most logical decision is to have [C.E.] supervise and purge for the 2nd shift. That means, Dad, don't get involved with the purging unless you speak to one of us. During our respective shifts. ---- [C.E.] let's get you proficient with the process so you understand all the caveats. We can also make sure to have another employee trained during the 2nd shift, either as backup, or primary purge master.

Based on my training and experience, I recognize the language above as describing the process of marijuana extraction and distillation.

   b.   A second screenshot of a text message, exchanged with "HerbinArtisans"—believed to be KENNETH W. RHULE—RHULE, and other HerbinArtisans employees was saved in KENNETH W. RHULE's Google account. This text message was last modified on July 10, 2018, and was located a Google photos folder entitled "2016-06-21." In this text message, KENNETH W. RHULE stated:

> Dad and [C.E.], If no dry ice comes in, please communicate with the team on who needs to be in, pending any tasks you have for them. We want to productive with who is at the shop if we aren't processing.

Based on my training and experience, and information gained during the course of this investigation, I know that dry ice is used in extracting and distilling marijuana products.

   38.   In addition to exchanging text messages, RHULE also communicated with others, including KENNETH W. RHULE, regarding HerbinArtisans and its marijuana products via email.

   a.   For example, on April 28, 2019, RHULE, using krhule@icloud.com, and E.C. were cc'd on an email from B.S to J.B. entitled "intro to the Herbinartisans crew – NOT flying related." B.S. is affiliated with the Harvey Airfield, where RHULE and KENNETH W. RHULE stored their airplane. In this email, B.S. stated, in part:

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> [J.B.] meet [E.C.] . . . one of (the[?] Herbinartisans production manager).
> As discussed and following my chats with Kenny and Ken Rhule, although
> they do not have an immediate need for staff, they have both expressed a
> willingness to have you come out and see the facility/meet some of the
> team members . . . . as I have spoken to Kenny, Ken, and [E.C.] about
> giving you a look-see around their facility, please coordinate with [E.C.] to
> set up a mutually convenient time to go to their production facility and
> meet some of the crew.

In response, on May 23, 2019, J.B. emailed KENNETH W. RHULE stating, in part,
"Thank you for your time and the background on your operations, I liked what I saw and
the vision of the business.  I attached my resume that show's where I have been.  To me,
my next phase of work is more about where I am going.  Cannabusiness could be it."
That same day, KENNETH W. RHULE forwarded this email to RHULE.

        b.      RHULE also used krhule@icloud.com to discuss invoicing and
recordkeeping for HerbinArtisans.  For example, on December 2, 2015, C.E. emailed
RHULE, using krhule@icloud.com, and KENNETH W. RHULE, stating "Hey guys, I
took 2 oz of O.G. Kush to settle a personal debt.  I'm not sure how we should enter it into
the system."  Based on my training and experience, and information learned during the
course of this investigation, I know that O.G. Kush refers to a marijuana product.  That
same day, RHULE responded:

> Ok, thats a pretty simple transaction… Invoice the 2 ounces out to you at
> wholesale rate.  When thats done let me know the invoice #, and I will go in
> to xero and apply payment in full to the invoice, but instead of having you
> pay that in cash, I will apply the payment to your advances instead.  The net
> result would be the same as taking an advance for the wholesale price of the
> oil.

        c.      Additionally, RHULE used this account to discuss obtaining
marijuana trim in order to process marijuana distillates and extracts.  For example, on
December 4, 2015, RHULE, using krhule@icloud.com, sent an email to KENNETH W.
RHULE, forwarding a Craigslist email that said "have lb or 2 i'd like to have processed if
you do such jobs.  % to you.  & can trade bud for your products."  Based on my training

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and experience, and information learned during the course of this investigation, I know

2   that bud refers to marijuana.

3   **III.    Unlicensed Money Transmission**

4        39.    In addition to manufacturing marijuana distillates and extracts, KENNETH

5   W. RHULE also sold cryptocurrency in exchange for cash.  KENNETH W. RHULE,

6   using an account on localbitcoins.com, advertised in-person cash-for-bitcoin exchanges.

7   Localbitcoins.com is a website that allows users to post advertisements, listing exchange

8   rates and payment methods for buying and selling bitcoins, including allowing users to

9   connect with bitcoin sellers in their vicinities through in-person meetings where cash is

10  exchanged for bitcoins.

11       40.    From April 2018 until December 2018, law enforcement, or a cooperating

12  source working with law enforcement, exchanged more than $140,000 in cash for bitcoin

13  with KENNETH W. RHULE or his designee, using the Gimacut93 account.  This

14  account is registered in the name of RHULE's wife, Olga Rhule, using an email address

15  associated with RHULE.

16       41.    For example, in April 2018, HSI SA Judson Scott responded to an

17  advertisement posed by Gimacut93 on the website localbitcoins.com.  The advertisement

18  by Gimacut93 offered to sell bitcoin through an in-person exchange at a "public location

19  only."  The advertisement indicated that Gimacut93 sold bitcoin at fiat[5] exchange rate,

20  and would accept various forms of payment to include unregistered prepaid Visa or

21  MasterCard cards and "various other gift cards."  A review of the website

22  localbitcoins.com showed that Gimacut93 was an established, and apparently well-

23  known, bitcoin trader with history dating back two years and more than one thousand

24  confirmed trades.  Gimacut93 advertised a trade limit of $5,000 to $100,000.

25

26

27

28

[5] Fiat currency is "sovereign currency" or "real currency, the money of a government." *Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 20

42.     Based upon messages exchanged via text to the telephone number that Gimacut93 listed on localbitcoins.com—813-506-7673,[6] SA Scott arranged with Gimacut93 to exchange $12,000 for bitcoin.  The parties agreed to conduct the transaction on April 10, 2018, at a Starbucks in Seattle, Washington.

43.     On April 10, 2018, an HSI SA acting in an undercover capacity ("UCA-1"), met with Gimacut93—determined to be KENNETH W. RHULE base upon a review of Washington Department of Licensing records—inside the Starbucks, located in Seattle, Washington.  At the meeting, UCA-1 provided $12,000 to KENNETH W. RHULE. After KENNETH W. RHULE confirmed the amount of U.S. currency tendered by UCA-1, SA Scott texted his bitcoin wallet address to KENNETH W. RHULE's cell phone. Using a wallet application on his phone, RHULE transmitted bitcoin to the wallet designated by a SA Scott.  UCA-1 described SA Scott as his/her "partner."

44.     While waiting for confirmation that the bitcoin was sent to the wallet address provided by SA Scott, KENNETH W. RHULE spoke about his current line of work within the CBD[7] industry, explaining at one point during the meeting that he was doing "5, 10, or 20,000 kilo" CBD orders.[8]

45.     KENNETH W. RHULE also spoke at length about bitcoin mining and significant events related to the bitcoin industry.  Specifically, he indicated that he and his fraternal twin had previously mined bitcoin.  KENNETH W. RHULE further indicated that his parents had also invested in bitcoin and bitcoin mining.

---

[6] This telephone number is used by KENNETH W. RHULE.

[7] Based upon my training and experience, I know that CBD, or cannabidiol, is derived from the stalk and seed of the cannabis plant.  Cannabidiol (CBD) oil or CBD hemp oil is a natural botanical concentrate that is high in the compound CBD.  Of the numerous cannabinoids identified in the cannabis plant, CBD is the second most common after tetrahydrocannabinoil (THC).  As CBD oil is derived from the seeds and stalk of the cannabis plant, it does not contain THC and therefore is non-psychotropic.

[8] In addition to selling CBD, during the course of their communications, RHULE also told UCA-1 that he was involved in installing lifesaving technologies (fire alarms, sprinkler systems), served as a consultant for CBD companies, and was involved in establishing bitcoin ATMs at casinos.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

46.     Notably, in response to UCA-1 indicating that UCA-1's partner was in a cash heavy business, KENNETH W. RHULE stated that bitcoin was only pseudo-anonymous and was "extremely easily tracked."  RHULE then explained that if he needed to "wash" bitcoin, he would convert it to Monero, which is "a 100% anonymous cryptocurrency."

47.     KENNETH W. RHULE did not charge a fee for the transaction but indicated that he had charged a 2-3% fee in the past.  He explained that he had a lot of bitcoin that he needed to "dump" right now, and that was the reason why he did not charge a fee.  KENNETH W. RHULE then explained that he usually had about $100,000 in bitcoin to work with each month, and sometimes more.  Law enforcement is investigating whether this bitcoin is derived from KENNETH W. RHULE and RHULE'S marijuana sales.

48.     During the cash-for-bitcoin transaction on April 10, 2018, and during subsequent exchanges, KENNETH W. RHULE did not ask UCA-1 for any "Know Your Customer" information.  Neither KENNETH W. RHULE nor RHULE are registered as a money services business with Financial Crimes Enforcement Network ("FinCEN") or the Washington Department of Financial Institutions ("DFI").

49.     Additionally, on June 20, 2018, SA Scott sent KENNETH W. RHULE a text message requesting another exchange of U.S. currency for bitcoin.  KENNETH W. RHULE agreed to conduct an exchange of $15,000 for bitcoin.  The parties agreed to conduct the transaction on June 22, 2018, at a Starbucks located in Seattle, Washington.

50.     On June 22, 2018, UCA-1 and KENNETH W. RHULE met at the Starbucks.  This meeting was audio and video recorded.  Upon sitting down at the table with UCA-1, KENNETH W. RHULE removed an Apple laptop computer from his bag and turned it on.  KENNETH W. RHULE explained that he brought the computer because he had to convert some Monero to Bitcoin during their meeting.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.    KENNETH W. RHULE explained to UCA-1 that he had told UCA-1's partner—SA Scott—that he would charge a 4% fee for this transaction, as there was an 8-10% drop in the price of Bitcoin overnight.

52.    UCA-1 handed an envelope to KENNETH W. RHULE with $15,000 in cash.  KENNETH W. RHULE proceeded to hand-count the $15,000.  As with the first two transactions, SA Scott provided KENNETH W. RHULE, via text to KENNETH W. RHULE's cell phone, with the bitcoin wallet address to which the bitcoin would be sent.  Using his phone and laptop, KENNETH W. RHULE then transferred the bitcoin to the wallet designated by SA Scott.

53.    While waiting for the transaction to be complete, UCA-1 explained that he/she was dealing with contacts in Ukraine to assist in bringing women to the United States for the purpose of prostitution.  Excerpts of this conversation are included below:

| | | |
|---|---|---|
| UCA-1: | With changing the business model that I've been operating under . . . I don't think we've talked about the business. | |
| KWR: | No. | |
| UCA-1: | I'm starting to operate with contacts in the Ukraine to help bring women here.  I don't want them to have any idea how to get a hold of me . . . identify me.  I want it all very anonymous. | |
| RHULE: | This is the way to go then.  Basically he can go on here and this is the wallet which you use and he can click received.  He will just have this one receive address that I send it to and this wallet is anonymous, which you use on TAILS.  If we're doing a trade like this and you didn't want to bring in a laptop or whatever, we can go search this address on the blockchain right after I do my transaction and you'll see right after when it is confirmed.  But this is the way to do it. | |
| KWR: | So from Ukraine cash to bitcoin for dollars, then the dollars can come into this country untaxed.  Any foreign investment dollars going to a business is not taxed. | |

***

| | |
|---|---|
| UCA-1: | I don't know much my partner's discussed with you. |
| KWR: | Nothing. |

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| UCA-1: | OK, so we talked about . . . my girlfriend who is also running girls, she moved into the oil fields of North Dakota. So she is going to send me the cash you the cash.  I've got the mailbox now, so can I give you the key. |
| KWR: | Sure. |
| UCA-1: | And you would pick up the cash and just send it to her bitcoin. |
| KWR: | Yes, I can do that. |

54.     During this transaction, KENNETH W. RHULE offered UCA-1 advice on how to avoid having the mailed cash seized and altered their plan to ensure greater security.  After discussing the above details regarding UCA-1's "new business model" of bringing women from Ukraine, as well as making arrangements regarding UCA-1' s girlfriend that was also "running girls" and would be sending KENNETH W. RHULE cash through the mail to purchase bitcoin, KENNETH W. RHULE proceeded to assist UCA-1 with setting up the TAILS operating system on his/her computer.  As with prior transactions, KENNETH W. RHULE did not ask UCA-1 for any "Know Your Customer" information.

## IV.     Involvement of Olga Rhule

55.     A portion of the **SUBJECT DEVICES** were seized from a residence where RHULE and his wife, Olga Rhule, were both residing.  Specifically, **SUBJECT DEVICE 8** through **SUBJECT DEVICES 19**[9] were found inside a residence on the Monroe Property where RHULE and Olga Rhule lived.

56.     Pursuant to a search warrant, law enforcement reviewed **SUBJECT DEVICE 18** and **SUBJECT DEVICE 19** and identified information that led them to believe that these devices were used or owned by Olga Rhule.  Accordingly, the following paragraphs describe reasons why there is probable cause to believe that

---

[9] **SUBJECT DEVICE 19** is comprised of 19 different USB devices; 18 of these devices were found inside the residence on the Monroe Property where RHULE and Olga Rhule resided.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  evidence related to the crimes under investigation would be located on Olga Rhule's

2  devices.

3      57.    As described above, KENNETH W. RHULE used an account on

4  LocalBitcoins.com, Gimacut93, to exchange cash for bitcoin, including with UCA-1.

5  The Gimacut93 account was registered to Olga Rhule.  Specifically, according to records

6  obtained from Local Bitcoins, the "Real Name" listed for Gimacut93 was "Olga

7  Vladimirovna Rhule."  Additionally, the driver's license submitted for Gimacut93 was

8  Olga Rhule's Washington driver's license.  The email address associated with the

9  Gimacut93 account was one registered to RHULE.

10     58.    Additionally, the Monroe Property is owned by the company Frontline

11  LLC, which was incorporated by Harvard Business Services.  The "Annual Billing

12  Information" stored by Harvard Business Services for Frontline LLC listed "Mr. Olga

13  Rhule" and an address in Mesquite, Nevada associated with RHULE's parents.  The

14  "Communications Contact Information" for the company also listed "Mr. Olga Rhule,"

15  and an email address associated with RHULE.  Furthermore, Olga Rhule's father,

16  Vladimir Gontcharov, was listed as the Managing Member for Frontline LLC.[10]  RHULE

17  emailed Harvard Business Services to incorporate Frontline LLC, using the alias "John

18  Kuhn."

19     59.    Olga Rhule is also associated with RKK Associates LLC, a company used

20  by RHULE to register vehicles, including a van found on the Monroe Property.  This van

21  is believed to have been used to transport marijuana since, at the time it was found, an

22  extension cord was running from a shed into the front passenger side of the van, which

23  was plugged into an electric air purifier that rested on the dashboard.  Additionally,

24  numerous small hanging air fresheners were scattered around the van.  Modifications had

25  also been made to the van's ventilation system along the front wall of the separate rear

26

27

28

[10] RHULE counsel has stated that RHULE is now the Managing Member of Frontline LLC.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   cargo transport area.  And finally, a K-9 dog alerted to the residual odor of narcotics

2   when he sniffed the van.

3       60.    Like Frontline LLC, RKK Associates LLC was incorporated by Harvard

4   Business Services.  The "Company and Contact Information" stored by Harvard Business

5   Services for RKK Associates LLC listed "Ms. Olga Goncharova," which is Olga Rhule's

6   maiden name.  The "Communications Contact Information" for the company also listed

7   "Mr. Olga Goncharova," and an email address associated with RHULE.  RHULE

8   emailed Harvard Business Services to incorporate RKK Associates, using the alias "John

9   Kuhn."

10      61.    Accordingly, devices owned or used by Olga Rhule may contain evidence

11  of the crimes under investigation.

12                          **TECHNICAL TERMS**

13      62.    Based on my training and experience, I use the following technical terms to

14  convey the following meanings:

15          a.    Wireless telephone:  A wireless telephone (or mobile telephone, or

16  cellular telephone) is a handheld wireless device used for voice and data communication

17  through radio signals.  These telephones send signals through networks of

18  transmitter/receivers, enabling communication with other wireless telephones or

19  traditional "land line" telephones.  A wireless telephone usually contains a "call log,"

20  which records the telephone number, date, and time of calls made to and from the phone.

21  In addition to enabling voice communications, wireless telephones offer a broad range of

22  capabilities.  These capabilities include: storing names and phone numbers in electronic

23  "address books;" sending, receiving, and storing text messages and e-mail; taking,

24  sending, receiving, and storing still photographs and moving video; storing and playing

25  back audio files; storing dates, appointments, and other information on personal

26  calendars; and accessing and downloading information from the Internet.  Wireless

27  telephones may also include global positioning system ("GPS") technology for

28  determining the location of the device.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      b.      Digital camera:  A digital camera is a camera that records pictures as

2  digital picture files, rather than by using photographic film.  Digital cameras use a variety

3  of fixed and removable storage media to store their recorded images.  Images can usually

4  be retrieved by connecting the camera to a computer or by connecting the removable

5  storage medium to a separate reader.  Removable storage media include various types of

6  flash memory cards or miniature hard drives.  Most digital cameras also include a screen

7  for viewing the stored images.  This storage media can contain any digital data, including

8  data unrelated to photographs or videos.

9      c.      Portable media player:  A portable media player (or "MP3 Player" or

10  iPod) is a handheld digital storage device designed primarily to store and play audio,

11  video, or photographic files.  However, a portable media player can also store other

12  digital data.  Some portable media players can use removable storage media.  Removable

13  storage media include various types of flash memory cards or miniature hard drives.  This

14  removable storage media can also store any digital data.  Depending on the model, a

15  portable media player may have the ability to store very large amounts of electronic data

16  and may offer additional features such as a calendar, contact list, clock, or games.

17      d.      GPS:  A GPS navigation device uses the Global Positioning System

18  to display its current location.  It often contains records of the locations where it has been.

19  Some GPS navigation devices can give a user driving or walking directions to another

20  location.  These devices can contain records of the addresses or locations involved in

21  such navigation.  The Global Positioning System (generally abbreviated "GPS") consists

22  of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely

23  accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation

24  of the current time, combined with a special sequence of numbers.  These signals are sent

25  by radio, using specifications that are publicly available.  A GPS antenna on Earth can

26  receive those signals.  When a GPS antenna receives signals from at least four satellites, a

27  computer connected to that antenna can mathematically calculate the antenna's latitude,

28  longitude, and sometimes altitude with a high level of precision.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      e. PDA:  A personal digital assistant, or PDA, is a handheld electronic

2    device used for storing data (such as names, addresses, appointments or notes) and

3    utilizing computer programs.  Some PDAs also function as wireless communication

4    devices and are used to access the Internet and send and receive e-mail.  PDAs usually

5    include a memory card or other removable storage media for storing data and a keyboard

6    and/or touch screen for entering data.  Removable storage media include various types of

7    flash memory cards or miniature hard drives.  This removable storage media can store

8    any digital data.  Most PDAs run computer software, giving them many of the same

9    capabilities as personal computers.  For example, PDA users can work with word-

10   processing documents, spreadsheets, and presentations.  PDAs may also include global

11   positioning system ("GPS") technology for determining the location of the device.

12     f. IP Address: An Internet Protocol address (or simply "IP address") is

13   a unique numeric address used by computers on the Internet.  An IP address is a series of

14   four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every

15   device attached to the Internet must be assigned an IP address so that Internet traffic sent

16   from and directed to that device may be directed properly from its source to its

17   destination.  Most Internet service providers control a range of IP addresses.

18     g. Internet: The Internet is a global network of computers and other

19   electronic devices that communicate with each other.  Due to the structure of the Internet,

20   connections between devices on the Internet often cross state and international borders,

21   even when the devices communicating with each other are in the same state.

22     63. Based on my training, experience, and research, and from consulting the

23   manufacturer's advertisements and product technical specifications available online, I

24   know that the **SUBJECT DEVICES** have capabilities that allow them to serve as

25   wireless telephones (including via Apple FaceTime and iMessage), digital cameras,

26   portable media players, GPS devices, and PDAs.  In my training and experience,

27   examining data stored on devices of this type can uncover, among other things, evidence

28   that reveals or suggests who possessed or used the devices.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

64. Based on my knowledge, training, and experience, I know that digital devices and electronic storage media can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet. This information can sometimes be recovered with forensic tools.

65. There is probable cause to believe that things that were once stored on the **SUBJECT DEVICES** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   this evidence, because special software is typically required for that task.  However, it is

2   technically possible to delete this information.

3          d.      Similarly, files that have been viewed via the Internet are sometimes

4   automatically downloaded into a temporary Internet directory or "cache."

5          66.     *Forensic evidence*.  As further described in Attachment B, this application

6   seeks permission to locate not only electronically stored information that might serve as

7   direct evidence of the crimes described on the warrant, but also forensic evidence that

8   establishes how the **SUBJECT DEVICES** were used, the purpose of its use, who used it,

9   and when.  There is probable cause to believe that this forensic electronic evidence might

10  be on the **SUBJECT DEVICES** because:

11         a.      Data on the storage medium can provide evidence of a file that was

12  once on the storage medium but has since been deleted or edited, or of a deleted portion

13  of a file (such as a paragraph that has been deleted from a word processing file).  Virtual

14  memory paging systems can leave traces of information on the storage medium that show

15  what tasks and processes were recently active.  Web browsers, e-mail programs, and chat

16  programs store configuration information on the storage medium that can reveal

17  information such as online nicknames and passwords.  Operating systems can record

18  additional information, such as the attachment of peripherals, the attachment of USB

19  flash storage devices or other external storage media, and the times the computer was in

20  use. Computer file systems can record information about the dates files were created and

21  the sequence in which they were created.

22         b.      As explained herein, information stored within a computer and other

23  electronic storage media may provide crucial evidence of the "who, what, why, when,

24  where, and how" of the criminal conduct under investigation, thus enabling the United

25  States to establish and prove each element or alternatively, to exclude the innocent from

26  further suspicion.  In my training and experience, information stored within a computer

27  or storage media (e.g., registry information, communications, images and movies,

28  transactional information, records of session times and durations, internet history, and

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 30

1  anti-virus, spyware, and malware detection programs) can indicate who has used or
2  controlled the computer or storage media.  This "user attribution" evidence is analogous
3  to the search for "indicia of occupancy" while executing a search warrant at a residence.
4  The existence or absence of anti-virus, spyware, and malware detection programs may
5  indicate whether the computer was remotely accessed, thus inculpating or exculpating the
6  computer owner and/or others with direct physical access to the computer.  Further,
7  computer and storage media activity can indicate how and when the computer or storage
8  media was accessed or used.  For example, as described herein, computers typically
9  contain information that log: computer user account session times and durations,
10  computer activity associated with user accounts, electronic storage media that connected
11  with the computer, and the IP addresses through which the computer accessed networks
12  and the internet.  Such information allows investigators to understand the chronological
13  context of computer or electronic storage media access, use, and events relating to the
14  crime under investigation.[11]  Additionally, some information stored within a computer or
15  electronic storage media may provide crucial evidence relating to the physical location of
16  other evidence and the suspect.  For example, images stored on a computer may both
17  show a particular location and have geolocation information incorporated into its file
18  data.  Such file data typically also contains information indicating when the file or image
19  was created.  The existence of such image files, along with external device connection
20  logs, may also indicate the presence of additional electronic storage media (e.g., a digital
21  camera or cellular phone with an incorporated camera).  The geographic and timeline
22  information described herein may either inculpate or exculpate the computer user.  Last,
23  information stored within a computer may provide relevant insight into the computer
24
25  _____
26  [11] For example, if the examination of a computer shows that:  a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at
27  11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an
28  investigator may reasonably draw an inference that John Doe downloaded child pornography.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 31

1    user's state of mind as it relates to the offense under investigation.  For example,

2    information within the computer may indicate the owner's motive and intent to commit a

3    crime (e.g., internet searches indicating criminal planning), or consciousness of guilt

4    (e.g., running a "wiping" program to destroy evidence on the computer or password

5    protecting/encrypting such evidence in an effort to conceal it from law enforcement).

6         c.     A person with appropriate familiarity with how an electronic device

7    works may, after examining this forensic evidence in its proper context, be able to draw

8    conclusions about how electronic devices were used, the purpose of their use, who used

9    them, and when.

10        d.     The process of identifying the exact electronically stored

11   information on a storage medium that are necessary to draw an accurate conclusion is a

12   dynamic process.  Electronic evidence is not always data that can be merely reviewed by

13   a review team and passed along to investigators.  Whether data stored on a computer is

14   evidence may depend on other information stored on the computer and the application of

15   knowledge about how a computer behaves.  Therefore, contextual information necessary

16   to understand other evidence also falls within the scope of the warrant.

17        e.     Further, in finding evidence of how a device was used, the purpose

18   of its use, who used it, and when, sometimes it is necessary to establish that a particular

19   thing is not present on a storage medium.

20        67.   *Manner of execution.*  Because this warrant seeks only permission to

21   examine a device already in law enforcement's possession, the execution of this warrant

22   does not involve the physical intrusion onto a premises.  Consequently, I submit there is

23   reasonable cause for the Court to authorize execution of the warrant at any time in the

24   day or night.

25                        **<u>SEARCH TECHNIQUES</u>**

26        68.   Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal

27   Rules of Criminal Procedure, the warrant I am applying for will permit imaging or

28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 32

1  otherwise copying all data contained on the **SUBJECT DEVICES**, and will specifically
2  authorize a review of the media or information consistent with the warrant.

3      69.    In accordance with the information in this affidavit, law enforcement
4  personnel will execute the search of the **SUBJECT DEVICES** pursuant to this warrant
5  as follows:

6          a.    **Securing the Data**

7              i.    In order to examine the ESI in a forensically sound manner,
8  law enforcement personnel with appropriate expertise will attempt to produce a complete
9  forensic image, if possible and appropriate, of the **SUBJECT DEVICES**.[12]

10             ii.    Law enforcement will only create an image of data physically
11 present on or within the **SUBJECT DEVICES**.  Creating an image of the **SUBJECT**
12 **DEVICES** will not result in access to any data physically located elsewhere.  However, a
13 **SUBJECT DEVICE** that has previously connected to devices at other locations may
14 contain data from those other locations.

15         b.    **Searching the Forensic Images**

16             i.    Searching the forensic images for the items described in
17 Attachment B may require a range of data analysis techniques.  In some cases, it is
18 possible for agents and analysts to conduct carefully targeted searches that can locate
19 evidence without requiring a time-consuming manual search through unrelated materials
20 that may be commingled with criminal evidence.  In other cases, however, such

---

[12] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 33

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1   techniques may not yield the evidence described in the warrant, and law enforcement

2   may need to conduct more extensive searches to locate evidence that falls within the

3   scope of the warrant.  The search techniques that will be used will be only those

4   methodologies, techniques and protocols as may reasonably be expected to find, identify,

5   segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to

6   this affidavit.

7                              **CONCLUSION**

8        70.    I submit that this affidavit supports probable cause for a search warrant

9   authorizing the examination of the **SUBJECT DEVICES** described in Attachment A to

10  seek the items described in Attachment B.

11

12                          VICTOR MORALES

13                          Special Agent, DEA

14        The above-named agent provided a sworn statement attesting to the truth of the

15  contents of the foregoing affidavit on the 26th day of January, 2021.

16

17

18                          HON.  PAULA L. MCCANDLIS

19                          United States Magistrate Judge

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 34

1    **ATTACHMENT A**

2    The property to be searched is:

3    a.    A Silver iPhone 6s Model A1633 (2021300100001601-1)

4    **(SUBJECT DEVICE 1)**;[13]

5    b.    A Silver Apple iPhone in Clear Case with Red Trim

6    (2020300100013101-8) **(SUBJECT DEVICE 2)**;

7    c.    Small media storage devices (2020300100013101-9) **(SUBJECT**

8    **DEVICE 3)**;

9    d.    A White Apple iPhone (2020300100011901-12) **(SUBJECT**

10   **DEVICE 4)**;

11   e.    A Black LG Cell Phone (2020300100011901-12) **(SUBJECT**

12   **DEVICE 5)**;

13   f.    An Apple iPhone in a Black Case (2020300100011901-12)

14   **(SUBJECT DEVICE 6)**;

15   g.    A Tower RM850X Computer (2020300100011901-18) **(SUBJECT**

16   **DEVICE 7)**;

17   h.    A Black Apple iPhone Model A1661 (2020300190000601-18)

18   **(SUBJECT DEVICE 8)**;

19   i.    A Gray Apple iPhone 11 Pro (2020300190000601-19) **(SUBJECT**

20   **DEVICE 9)**;

21   j.    A Gray Apple iPhone 8 Plus (20200300190000601-20) **(SUBJECT**

22   **DEVICE 10)**;

23   k.    A Gray Apple iPhone 5 Model A1429 (2020300190000601-21)

24   **(SUBJECT DEVICE 11)**;

25   l.    A Silver Apple MacBook Air Model A1466 (2020300190000601-

26   24) **(SUBJECT DEVICE 12)**;

27   _____

28   [13] The number contained in the parenthetical refers to law enforcement's internal seizure number.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 35

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         m.      A Gray Apple MacBook Air Model A1989 (2020300190000601-25)

2 **(SUBJECT DEVICE 13)**;

3         n.      A Silver HP Laptop Model 14 (2020300190000601-26) **(SUBJECT**

4 **DEVICE 14)**;

5         o.      A Black/Silver Dell XPS Laptop Model PP28L

6 (2020300190000601-28) **(SUBJECT DEVICE 15)**;

7         p.      A Gray Apple iPad Model A1674 (2020300190000601-29)

8 **(SUBJECT DEVICE 16)**;

9         q.      A Gray Apple iPad Model A1893 (2020300190000601-30)

10 **(SUBJECT DEVICE 17)**;

11         r.      A Black Samsung Tablet Model SM-T217S (202030019000601-31)

12 **(SUBJECT DEVICE 18)**; and

13         s.      19 USB Drives (2020300190000601-33) **(SUBJECT DEVICES**

14 **19)**;

15 (hereinafter the "**SUBJECT DEVICES**").  The **SUBJECT DEVICES** were seized on:

16         a.      March 10, 2020, during the execution of a federal search warrant at

17 29428 181st Street in Monroe, Washington;

18         b.      July 14, 2020, during the arrest of KENNETH JOHN RHULE in the

19 District of Hawaii;

20         c.      March 13, 2020, during the execution of a federal search warrant on

21 KENNETH WARREN RHULE's GMC Truck; and

22         d.      March 10, 2020, during the execution of a federal search warrant at

23 3614 183rd Street Southeast in Bothell, Washington.

24       The **SUBJECT DEVICES** are currently located at 1000 2nd Avenue, Seattle,

25 Washington 98104.  This warrant authorizes the forensic examination of the **SUBJECT**

26 **DEVICES** for the purpose of identifying the electronically stored information described

27 in Attachment B.

28

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 36

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1956 (Money Laundering Conspiracy), 1960 (Operating an Unlicensed Money Transmitting Business) and Title 21, United States Code, Sections 841 and 846 (Conspiracy to Manufacture and Distribute Marijuana or Marijuana Distillates) and occurring in or after October 2014, as follows:

a.  The growth, manufacture, distribution, or sale of marijuana and marijuana distillates and extracts, including the acquisition of marijuana trim;

b.  The owners, operators, employees, locations, assets, and business purpose of the companies HerbinArtisans, Frontline LLC, and RKK Associates LLC, or any other companies associated with KENNETH WARREN RHULE or KENNETH JOHN RHULE;

c.  Items, records, or information concerning the use, creation, or operation of HerbinArtisans, Frontline LLC, and RKK Associates LLC, or any other companies associated with KENNETH WARREN RHULE or KENNETH JOHN RHULE;

d.  The receipt or conversion of cryptocurrency, including the receipt of cryptocurrency in exchange for marijuana distillates and extracts;

e.  Items, records, or information relating to the use of Instagram, Craigslist or social media outlets to advertise or post pictures of marijuana or marijuana distillates and extracts;

d.  Items, records, or information relating to acquiring, maintaining, or using supplies or equipment to manufacture and distribute marijuana or marijuana distillates and extracts;

e.  Items, records, or information relating to the transfer, purchase, sale, or disposition of cryptocurrency;

f.  Items, records, or information concerning the use, creation, or operation of HerbinArtisans;

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 37

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      Items, records, or information concerning communications with individuals regarding the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

h.      Items, records, or information related to KENNETH WARREN RHULE's or KENNETH JOHN RHULE's travel to purchase, advertise, or sell marijuana or marijuana distillates and extracts, or to acquire equipment used to sell marijuana distillates and extracts;

i.      Items, records, or information relating to the receipt or sale of cryptocurrency, including the receipt of cryptocurrency in exchange for marijuana or marijuana distillates and extracts;

j.      Items, records, or information relating to the operation of money transmitting businesses, including without limitation, documents and other records relating to the creation or advertisement on websites, cryptocurrency accounts, customer transactions, and communications with others about any of the aforementioned subjects;

k.      Items, records, or information concerning communications with individuals regarding cryptocurrency transactions, localbitcoins.com, or the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

l.      Items, records, or information concerning advertisements on localbitcoins.com, other peer to peer cryptocurrency platforms, or other advertisements or informal offers to sell or buy cryptocurrency;

m.      Items, records, or information reflecting the use of a moniker or handle, including but not limited to Gimacut93, or other online monikers or pseudonyms, reflecting the use of accounts, including those on cryptocurrency marketplaces such as localbitcoins.com, and communications or writings reflecting patterns or idiosyncrasies associated with those online monikers that may be associated with online chats or communications regarding the offenses under investigation;

n.      Items, records, or information concerning the identities and contact information (including mailing addresses) of any individuals who have purchased or attempted to purchase cryptocurrency from KENNETH WARREN RHULE or KENNETH JOHN RHULE, saved in any form;

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

o.  Items, records, or information concerning KENNETH WARREN RHULE's location or travel to sell cryptocurrency;

p.  Any and all applications, documents, records, or information relating to communication with the Financial Crimes Enforcement Network ("FinCEN") or the Washington State Department of Revenue ("DOR"), Division of Banking;

q.  Any and all applications, documents, records or information regarding applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington;

r.  All bank records, checks, credit card bills, account information, storage unit information, safe deposit box information, and other financial records demonstrating KENNETH WARREN RHULE's or KENNETH JOHN RHULE's assets;

s.  Items, records, or information concerning financial transactions associated with the operations of a marijuana or money transmitting business or the laundering of currency and cryptocurrency, including without limitation, any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers, records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies such as bitcoin, cryptocurrency private keys and recovery seeds, packing material or inserts relating to any transactions with any cash-for-bitcoin exchange, and communications with financial services representatives, co-conspirators, or other third parties about any of the aforementioned subjects;

t.  All copies of income tax returns filed with the Internal Revenue Service ("IRS") or the Washington DOR;

u.  Items, records, or information showing employment or lack of employment;

v.  Items, records, or information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords, including TAILS passwords and PGP keys;

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 39

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

w.  Items, records, or information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

x.  Items, records, or information concerning advertisements or efforts to sell marijuana products to others;

y.  Any and all applications, documents, records or information regarding applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington;

z.  Evidence indicating how and when the devices were accessed or used, to determine the chronological and geographic context of device access, use and events relating to the crime under investigation and the device owner;

aa.  Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

bb.  Evidence indicating the device owner's state of mind as it relates to the crime under investigation;

cc.  Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

dd.  Any and all cryptocurrency, to include the following: (a) any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format; (b) any and all representations of cryptocurrency private keys, whether in electronic or physical format; and (c) any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" and "root keys" which may be used to regenerate a wallet;

ee.  Cryptocurrency applications and wallets, to include information regarding current account balance and transaction history, i.e., date, time, amount, an address of the sender/recipient of a cryptocurrency transaction maintained in such wallets; and

ff.  Any records or information reflecting cryptocurrencies, including web history, and documents showing the location, source, and timing of acquisition of any cryptocurrencies, to include wallets, wallet addresses,

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 40

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and seed phrases.

2. Evidence of user attribution showing who used or owned the **SUBJECT DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AFFIDAVIT OF SPECIAL AGENT MORALES
USAO# 2018R00575- 41

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970